DEPARTMENT OF TREASURY, GROSS INCOME TAX DIVISION, ET AL. *v.* RANGER-COOK, INC.

[No. 17,062. Filed June 25, 1943. Rehearing denied September 29, 1943. Transfer denied October 25, 1943.]

*James A. Emmert,* Attorney General; *Winslow Van Horne* and *John J. McShane,* Deputy Attorneys General, for appellants.

*Ralph Bamberger, Julian Bamberger, Isidore Feibleman* and *Charles B. Feibleman,* all of Indianapolis, for appellee.

ROYSE, C. J.—Appellee brought this action to recover certain sums paid as gross income tax under the Indiana Gross Income Tax Act (Acts 1937, ch. 117), contending that the amounts received by it in its business constituted gross income derived from "wholesale sales," subject to gross income tax at the rate of ¼ of 1%, whereas appellants contend that the amounts received by appellee did not constitute "wholesale sales" and that such amounts were subject to gross income tax at the rate of 1%. Trial by the court upon a stipulation of facts. Judgment in favor of appellee and against appellants.

The overruling of appellants' motion for a new trial is the only error assigned here. The causes relied on in said motion are: (1) The decision of the court is not sustained by sufficient evidence; (2) the decision of the court is contrary to law.

The sole question here for determination is: Does the evidence show that appellee comes within the provisions of the Gross Income Tax Act defining "wholesale sales," as provided in § 3 (a) thereof?

The pertinent provisions of the statute (Acts 1937,

ch. 117, § 3 (a), § 64-2603, Burns' 1933 Supp.) are as follows:

> "(a) . . . The term 'wholesale sales' means and includes only the following: . . . (2) sales of any tangible personal property as a material which is to be directly consumed in direct production by the purchaser in the business of producing tangible personal property by manufacturing, processing, refining, repairing, mining, agriculture, or horticulture; (3) sales of any tangible personal property which is to be incorporated by the purchaser as a material or an integral part into tangible property produced by such purchaser in the business of manufacturing, assembling, constructing, refining, or processing; . . . Provided, further, That the term 'consumed' as used herein shall refer only to the immediate dissipation or expenditure by combustion, use, or application, and shall not mean or include, the absolescence, discarding, disuse, depreciation, damage, wear, or breakage, of tools, dies, equipment, rolling stock or its accessories, machinery, or furnishings."

The evidence was stipulated, and that necessary to a determination of the question here presented is as follows:

The plaintiff is engaged in the business of typesetting at its principal place of business in South Bend, Indiana, and its method of doing business is as follows:

The plaintiff as typesetter receives a manuscript copy from a printing concern regularly engaged in the business of printing. This manuscript, when furnished by the printer, may contain directions with reference to the size and style type to be used, spacing, etc., but in the usual case, these matters are all determined by the typesetter. The plaintiff, upon receiving the manuscript copy from the printer, checks over the manuscript, marks the copy for the guidance of its typesetters, and then sets the matter in type with a type-

setting machine (such as a linotype or similar mechanical equipment) or by hand composition, in conformity with the manuscript copy and the direction of the printer. The machinery turns out an entire line of the manuscript at one time on a single slug made of lead alloy. Each line of type composition is a specially made unit available only for the particular printing job reflected by the manuscript. In that line of type the alignment of the letters is such that the line can only be used on the one particular job for which it was created, since the message to be imparted in printed messages varies considerably, and a new manuscript is followed with reference to each specific order. When the plaintiff has set the type in conformity with the manuscript and direction of the printer, the completed lines of type are called "type composition." After completing the type composition, proofs are taken and read, and any corrections found to be necessary are made by recasting the particular line in which the error occurs and by placing the corrected line in lieu of the line of type containing the error. At this point further proofs are taken and are submitted to the printer for his approval. If the printer indicates that certain corrections or alterations are to be made, he returns the proof and such alterations or corrections are made by recasting the lines in which such corrections or alterations are necessary and substituting the recast slugs or lines for the ones indicated by the printer on the printed proof. The type composition is then delivered to the printer.

The type composition prepared by the plaintiff as a typesetter is utilized by the printer by placing it on a printing press, which in its operation inks the type composition and brings it into contact with paper, thereby creating a printed impression upon such paper.

So utilized, a completed line of type, known as a slug, can be used to make 35,000 to 40,000 impressions before that particular line of type would begin to make impressions which were a trifle off-color, or dark—upon the happening of which the line of type or slug would ordinarily be recast. The 35,000 or 40,000 impressions could be run off within two days or less, and smaller jobs could be run off in a few hours. The types of printing presses ordinarily used by job printers will produce from 1,500 to 4,000 or more impressions per hour. Ordinarily each piece of type composition is specially produced, so that it can be used only for a particular printing assignment, and ordinarily its value is used up at the end of the printing of that particular job, except for its salvage value as lead. However, the type composition for printed forms may be kept standing ready for use in a printing establishment, to be used again as orders are received for such printed forms. This is a rare practice used only in a small percentage of cases.

Type composition is sold to the printer as a completed article. The price includes the cost of materials. After the type composition has been used on the particular job for which it was manufactured, it has no further value whatever, except for its salvage value as lead.

As type composition reproduces the particular manuscript furnished for each printing job in leaden line form, it is custom-cast for one particular printing job alone. The type composition produced by Ranger-Cook, Inc., during the taxing periods in question, was rarely used on printing jobs requiring 35,000 printed impressions.

The plaintiff has paid gross income tax to the defendant, Department of Treasury, computed by apply-

ing the rate of one per cent to the plaintiff's receipts derived from typesetting.

The plaintiff filed its written petition for refund with the Gross Income Tax Division of the Department of Treasury of the State of Indiana on December 6, 1940, and thereafter the said Gross Income Tax Division wholly denied plaintiff's petition for refund and notified the plaintiff in writing of such denial by a letter dated December 6, 1940, which written denial of plaintiff's petition for refund was received by the plaintiff through the United States mail on December 7, 1940.

The established accounting practice utilized by many engaged in the printing industry in the State of Indiana divides costs of production into five categories: (1) Materials; (2) fixed expenses; (3) factory expenses; (4) administrative expenses; and (5) sales expenses. Under this system of bookkeeping, purchases of type composition are set down by the printers as being an expense for materials.

Appellants contend that appellee's income from typesetting is not derived from "wholesale sales" as defined in the statute. It is appellants' theory that these "slugs of type" are tools and equipment; that they are not sold as a material which is directly consumed in direct production. However, appellants admit these slugs are tangible personal property.

A determination of this contention requires a construction of the section of the statute set out above. It is an elementary. rule of statutory construction, that words in common use are to be given their natural, plain, ordinary, and commonly understood meaning, unless it is plain from the statute that a different meaning was intended. 59 C. J. 975, § 577. With this rule in mind we proceed to a deter-

mination of whether or not the "slugs of type" referred to herein are tools or equipment.

The word "tool" has a well-understood meaning; it is "an instrument of manual operation, as a hammer, saw, plane, file or the like, used to facilitate mechanical operations, as distinguished from an appliance moved and regulated by machinery; the instrument of a handicraftsman or laborer at his work." Webster's New International Dictionary, Sec. Ed., p. 2667; *Murphy* v. *Continental Ins. Co.*, 178 Iowa 375, 157 N. W. 855, 857, L. R. A. 1917B, 934.

> We believe the evidence is clear that these ■ slugs do not come within the commonly understood meaning of the word "tool."

"Equipment" is defined as: "Whatever is needed in equipping; . . . the articles comprised in an outfit; . . . equippage." Webster's *supra*. While we ■ recognize that in a sense these slugs might come within this definition, we believe they are more readily identifiable as material, which is defined by Webster's, *supra,* as: "The substance or substances, or the parts, goods, stock, or the like, of which anything is composed or may be made, or which is necessary to the doing of something. . . ." And, if they are susceptible to both definitions, we must adopt the one most favorable to the taxpayer. *Department of Treasury of Indiana* v. *Muessel et al.* (1941), 218 Ind. 250, 32 N. E. (2d) 596; *Gross Income Tax Department of Treasury et al.* v. *Harbison-Walker Refactories Company* (1943), 113 Ind. App. 695, 48 N. E. (2d) 834.

This brings us to a consideration of whether or not these "slugs" are "directly consumed in direct production by the purchaser in the business of producing tangible personal property by manufacturing, process-

ing, etc." The statute provides its own definition of the phrase "directly consumed," by providing that it "shall refer only to the immediate dissipation or expenditure by combustion, use or application." It is certain these slugs are not dissipated or expended by combustion. Therefore, if appellee, in the sale of these slugs, is making "wholesale sales," it is because they are consumed by use or application. The evidence discloses these slugs are used by the printer by placing them on a printing press, which inks the type and brings it into contact with the paper, thereby creating a printed impression on the paper. These slugs are custom-cast for one particular job and ordinarily can only be used on that job. They can make from 35,000 to 40,000 impressions, which can be run off in not to exceed two days. Appellee's customers generally used these slugs for much smaller jobs which were run off in a few hours. They were then used up, dissipated or expended, except for what might be obtained as salvage from the lead.

We are of the opinion the facts indicate these "slugs" were directly consumed by use or application. It may be, as appellants contend, that the slugs were discarded or made valueless by obsolescence, but we believe the Legislature intended that this exclusion should apply only to tools, dies, etc.

The judgment of the Superior Court of Marion County is affirmed.

NOTE.—Reported in 49 N. E. (2d) 548.